**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ASSOCIATES IN EMERGENCY RESPONSE, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**REDLINE GLOBAL, LLC,**<br>**ATLYS GROUP, LLC,**<br>**ATLYS GLOBAL, LLC,**<br>**RANCE MACFARLAND,**<br><br>Defendants. | Civil No. 23-1058 (MBA) |

**OMNIBUS OPINION AND ORDER**

Plaintiff Associates in Emergency Response, LLC ("AER") brought this civil action against Defendants Redline Global, LLC ("Redline"), Rance MacFarland, Atlys Global, LLC ("Global") and Atlys Group, LLC ("Group"), the latter two collectively referred to as "Atlys Entities," alleging eight causes of action: Count I alleges breach of contract; Count II alleges fraud, Count III alleges fraud in the inducement; Count IV alleges negligent misrepresentation; Count V alleges breach of fiduciary duty; Count VI requests an equitable accounting; Count VII alleges Louisianna consumer protection claims; and Count VIII alleges conspiracy. (ECF No. 1).[1] AER moved for partial summary judgment on two points: Redline's contractual liability under the Toa Baja subcontract, and the undisputed sum it is owed. (ECF Nos. 134, 135). Defendants opposed, and separately moved for summary judgment on all counts. (ECF Nos. 136, 137). Plaintiff opposed. (ECF Nos. 139, 140). Both sides filed replies. (ECF Nos. 141–43). For the reasons set forth below, Plaintiff's motions for partial summary judgment are **GRANTED**. Defendants' motions for summary judgment are **GRANTED** in part and **DENIED** in part.

[1] Rance MacFarland has not appeared in this case, resulting in a default entry against him. (ECF No. 42). Unless otherwise indicated, "Defendants" refers to Redline, Group, and Global.

## BACKGROUND FACTS[2]

In September 2017, the Federal Emergency Management Agency ("FEMA") issued a major disaster declaration for Hurricane Maria in Puerto Rico, creating a surge of recovery work under FEMA's Public Assistance Program. (ECF No. 137-1 ¶¶ 186-87). The parties' business relationship arises from that recovery work.

### I. Parties and Formation of the Business Relationship

Plaintiff AER is a Louisiana limited liability company whose sole owner and member of record is Amanda Smith. (ECF No. 1 ¶ 1). AER provides emergency management, consulting, and professional services to governments and municipalities following natural disasters. (*Id.* ¶ 7). Defendant Redline is a Puerto Rico limited liability company organized in 2017 to provide disaster relief services in Puerto Rico following hurricane Maria. (*Id.* ¶ 8). Redline's current owners are AG Redline, LLC and AG Redline Holdings, LLC, neither of which are parties to this action. (ECF No. 137-1 ¶ 29). The latter two corporations are owned by Defendant Global. (ECF No. 137-1 ¶ 32).

Group is a Delaware limited liability company organized in 2014 by Frank Robinson with an original purpose of "financing renewable energy," and later expanded to provide emergency relief funding. (Robinson Dep. at 10). Group "does not have any business today," and is owned by Defendant Global. (ECF No. 136-1 ¶ 34, 36). Global is a Delaware limited liability company formed in 2018. (*Id.* ¶ 75). Global is owned by Atlys Holdings, LLC and the Brian R. Williamson Trust—Atlys Holdings, in turn, is owned by Frank Robinson, founder of Group. (*Id.* ¶ 77, 81). Global "runs a lending platform that reviews and underwrites loan applications." (*Id.* ¶ 84).

In January 2018, AER and Redline entered into a Teaming Agreement for the purpose of jointly pursuing contracting opportunities for disaster relief services, including labor and consulting services, following Hurricane Maria. (ECF No. 137-1 ¶ 50). The Teaming Agreement contemplated that the parties would strategically team together, with their respective roles to be determined on a project-by-project basis. (ECF No. 136-15). According to the agreement, when project opportunities were identified and awarded to either party, the non-prime contractor would be named a team member

[2] Unless otherwise indicated, the following facts were sourced from Defendants' summary judgment record. (ECF Nos. 136, 137).

or subcontractor, with a Statement of Work or Task Order defining the subcontractor's technical participation and compensation. (*Id.* at 1). Once subcontract was awarded "the relationship between the parties" would be determined by such Subcontract. (*Id.* at 3-4). The agreement required the parties to "act as an integrated team to accomplish the effort required," and to "use their best efforts to promote the mutual profit, benefit, and advantage of the other Parties." (*Id.* at 2, 5).

**II. Receivables Agreement and Initial Financing Structure**

Shortly after the Teaming Agreement was executed, Redline entered into a series of financing arrangements. On February 1, 2018, seven days after the Teaming Agreement, Redline entered into a Receivables Assignment Agreement with Group whereby Redline agreed to "sell[], transfer[] and assign[]" its receivables to Group, and Group "purchas[ed] and accept[ed]" those receivables as their "absolute owner." (ECF No. 136-11 at 1). According to the agreement, Group was authorized to advance funds against assigned invoices and obtained an irrevocable power of attorney authorizing it to endorse checks, execute assignments, communicate directly with debtors, and undertake every action necessary to collect the purchased receivables. (*Id.* at 2-4).

AER also entered into a separate Funding Agreement with Redline whereby pursuant to a "Credit Facility," Redline would make "best efforts" to fund 65%-75% of AER's invoices. (ECF No. 137-1 ¶ 166). "[I]n consideration" of these services, Redline would "be entitled to a fee equal to 3% flat rate (the "Fee") on the invoiced receivable," and "interest at the rate of 2% per month on the outstanding balance of any Fee until such Fee is paid in full." (*Id.*).

**III. Grant Management Subcontracts and Project Work**

Between February and September 2018, Redline, acting as prime contractor, and AER, acting as subcontractor, secured multiple contracts to provide disaster relief and FEMA public assistance services throughout Puerto Rico. (ECF No. 137-1 ¶¶ 238–44). These projects were governed by individual Grant Management Subcontracts. (*Id.*). Under these contracts, AER performed grant management and FEMA public assistance consulting, project formulation, reimbursement tracking, disaster recovery services and submitted invoices to Redline for these services. (ECF No. 136-28). Redline's work included "among other, collection of data, conducting site inspections, development of project damage description and dimensions, scope of work, cost estimates and quality assurance

and quality control." (ECF No. 137-1 ¶ 196).

The Grant Management Subcontracts established the credit limit for each project, required AER to invoice Redline bi-weekly for work performed, and contemplated that Redline would make its best efforts to pay all invoices on time. (ECF No. 136-28).[3] The contracts also provided that an authorized representative from Redline would review each invoice and approve it for payment within five working days or conduct any audit deemed necessary. (*Id.*). The subcontracts' relevant language stated that the "[s]ubcontractor will assume responsibility as an independent contractor for professional services … and agrees to paid when paid terms." (*Id.* at 5). "The last day of AER's work for which it invoiced Redline was October 18, 2018." (ECF No. 137-1 ¶ 196).

According to AER's complaint, invoices for work performed in February and March 2018 were generally funded by Redline, though at times payments were made in amounts less than agreed upon. (ECF No. 23 ¶ 30). In late March 2018, payments from Redline "started arriving late, were frequently less than agreed upon, or in some cases, were not made." (*Id.* ¶ 31). According to AER, when it made inquiries with Redline about the late, short, or failed payments, AER contends it was directed to inquire with Atlys. (*Id.* ¶ 32). AER alleges that when inquiries were made with Group and/or Global concerning payments, AER would receive assurances from MacFarland, with explanations for delays varying but typically related to "internal changes or processing delays." (*Id.* ¶ 33).

The total amount AER invoiced across all projects was $3,370,017.07, of which Redline paid $1,230,430.37, leaving an unpaid balance of $2,139,586.70. (ECF Nos. 137-31). On April 30, 2019, Redline's Chief Financial Officer and Manager, Jorge R. Sánchez, sent a letter to AER asking AER to confirm Redline's records reflecting an outstanding balance of $2,026,563.56 as of December 31, 2018. (ECF Nos. 137-34). This letter was generated in connection with Redline's own independent financial audit. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate only when the movant shows that "there is no genuine

[3] For ease of reference, the Court will refer to the Toa Baja Grant Management Subcontract when citing specific contract language.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion and identifying those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has satisfied this burden, however, the burden shifts to the non-moving party to show that there is still "a trial worthy issue as to some material fact." *Cortés-Irizarry v. Corporación Insular*, 111 F.3d 184, 187 (1st Cir. 1997). "Cross-motions for summary judgment do not alter the basic…standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021) (quoting *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001)).

The Court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). Additionally, when courts are considering cross-motions for summary judgment, they must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *AJC Int'l, Inc. v. Triple–S Propiedad*, 790 F.3d 1, 3 (1st Cir. 2015) (quoting *D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011)). The Court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**APPLICABLE LAW**

Under Puerto Rico law, a contract is interpreted in its "literal sense," unless the words are somehow contrary to the contracting parties' intent. *Fernandez-Fernandez v. Mun. of Bayamon*, 942 F. Supp. 89, 94 (D.P.R. 1996) (citing 31 L.P.R.A. § 3471). "[W]here a contract's wording is explicit and

its language is unambiguous, the parties are bound by its clearly stated terms and conditions, leaving no room for further debate." *Lopez & Medina Corp. v. Marsh USA, Inc.*, 667 F.3d 58, 64 (1st Cir. 2012). "An agreement is clear when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation.'" *P.R. Tel. Co. v. Advanced Cellular Sys. (In re Advanced Cellular Sys.)*, 483 F.3d 7, 12 (1st Cir. 2007) (quoting *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987)). If a contract is determined to be ambiguous, however, the controlling factor is "the intention of the parties." *Cap. Crossing Servicing Co., LLC v. Mapfre Praico Ins. Co.*, 743 F. Supp. 3d 365, 496 (D.P.R. 2024) (citations omitted). The parties' intention "can be demonstrated by their conduct, both prior and subsequent to the execution of the contract." *Id.*

The First Circuit Court of Appeals has also "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." *Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007); *see also Colón v. Infotech Aerospace Servs., Inc.*, 869 F. Supp. 2d 220, 225-226 (D.P.R. 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'" *Calvi v. Knox County*, 470 F.3d 422, 427 (1st Cir. 2006). Local Rule 56, known as the "anti-ferret rule," is "intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." *Lopez-Hernandez v. Terumo Puerto Rico LLC*, 64 F.4th 22, 26 (1st Cir. 2023).

Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. It requires that a motion for summary judgment "be supported by a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." D.P.R. Civ. R. 56(b). Any opposing statement "shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." *Id.* 56(c). The facts themselves, and any opposition to them, must be supported by "a citation to the specific page or paragraph of identified record material supporting the assertion." *Id.* 56(e). Crucially, the court may disregard facts if they are not supported by such a citation. *Id.* Facts contained in either statement of material facts, if supported by record citations, "shall be deemed admitted unless properly

controverted." *Id.*

## ANALYSIS

Plaintiff AER moved for partial summary judgment on two issues. First, to establish liability under the Toa Baja subcontract. (ECF No. 134). Second, regarding the "undisputed" sum it is owed. (ECF No. 135). Defendants moved separately for summary judgment on all Counts. (ECF Nos 136, 137). The Court will consider the parties' motions together as cross-motions, reviewing the record claim by claim, and viewing properly supported facts in a light favorable to the nonmoving party. *See AJC Int'l, Inc.*, 790 F.3d at 3. In light of the upcoming trial date, the goal of this Omnibus Opinion is not to conclusively resolve each individual argument proffered by the parties, but merely to streamline the trial by identifying the counts in which genuine disputes of material facts persist, and summarily dispose of those claims where a triable issue is not present.

### I. Procedural Framework: Local Rule 56 and AER's Factual Showing

Before addressing the substantive arguments of the cross motions for summary judgment, the Court will first consider the procedural shortfalls of the parties' filings. Failure to comply with Local Rule 56 carries consequences. Where an opposing party fails to submit a compliant statement of material facts or fails to properly controvert a movant's factual assertions with specific record citations, the Court is justified in deeming the movant's facts admitted. *See Rodriguez-Severino*, 52 F.4th at 458. Courts in this District have repeatedly held that litigants ignore Local Rule 56 "at their peril." *Id.* However, even where certain facts are deemed admitted due to procedural noncompliance, the moving party does not automatically prevail on summary judgment. *See De la Vega v. San Juan Star, Inc.*, 377 F.3d 111, 116 (1st Cir. 2004) (finding reversible error in denial of summary judgment as a "sanction" for a local rule violation). The uncontested facts and other evidentiary facts of record must still establish the absence of a genuine dispute of material fact, and that the moving party is entitled to judgment as a matter of law. *See Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F.2d 1510, 1517 (1st Cir. 1991).

AER failed to comply with the local rules of this Court. Its failure to comply with Local Rule 56 in support of its own motion for summary judgment has procedural consequences, but not the dispositive effect Defendants urge. Local Rule 56 requires parties to present material facts in a separate

statement supported by specific record citations, and permits the Court to disregard factual assertions that are not presented in the manner required. *See López-Hernández*, 64 F.4th at 26. Accordingly, the Court will disregard factual assertions and conclusory statements contained in AER's motions to the extent they were not properly set forth and supported under Local Rule 56. *See P.R. Am. Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 130-32 (1st Cir. 2010) (noting that District Courts have broad but not unbridled discretion in applying the local rules); (ECF Nos 134, 135). In fairness to both parties, and due to the compressed schedule and upcoming trial date, the Court will not grant leave to amend the pleading, as requested by AER. (ECF No. 141 at 3-4).

AER's noncompliance, however, does not require the Court to deem Defendants' factual assertions admitted where AER later denied or qualified those assertions in its opposition. (ECF Nos. 139-1, 140-1). Local Rule 56 is designed to focus the Court on genuinely disputed facts, not a mechanism for granting summary judgment automatically without the analysis required by Federal Rule 56. *See P.R. Am. Ins. Co.*, 603 F.3d at 131 ("[I]t is primarily the role of the district court to determine what departures from a local rule may be tolerated."); *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (noting that Local Rule 56 "is in service to Federal Rule of Civil Procedure 56"). The Court therefore will consider the summary judgment record as a whole, "drawing all inferences in favor of each non-moving party in turn," including AER's properly supported arguments in opposition—and rejecting conclusory allegations from either party couched as undisputed facts. *See AJC Int'l, Inc.*, 790 F.3d at 3.

II. **Count I: Breach of Contract**

Moving on to the substantive claims, the central dispute in this case concerns how the parties' agreements fit together and what obligations each Defendant incurred under them. AER contends the Teaming Agreement, Funding Agreement, and Grant Management Subcontracts together formed an integrated business relationship under which Redline was obligated to submit, process, fund, and pay AER's invoices for completed disaster-recovery work. (ECF No. 139 at 2-3). Redline breached those obligations by failing to timely pay approved invoices, and by later asserting that payment was contingent on FEMA reimbursement, although, AER argues, Redline had already monetized project receivables either through financing arrangements, or simply by failing to collect payment. (ECF No.

135-1 at 13-14).

In its motion for summary judgment, Redline disputes that characterization. (ECF No. 137 at 9). It contends the Grant Management Subcontracts were "paid when paid" agreements, and that any obligation to pay AER depended on Redline first receiving reimbursement from FEMA or the municipalities. (*Id.*). Redline also contends that amounts advanced to AER under the Funding Agreement should be characterized as loans subject to repayment, rather than partial payments for completed work. (*Id.* at 7). Group and global, in turn, argue that they never entered into contracts with AER directly, rather their only contractual relationship was with Redline. (ECF No. 136 at 2). To the extent that MacFarland, as Global's managing partner, made any funding assurances to AER, those assurances did not bind Global. (*Id.* at 10).

For the reasons detailed below, the Court finds that there are genuine disputes of material fact that preclude granting Defendants' motions for summary judgment on Count I. Plaintiff's motions for partial summary judgment are **GRANTED.** Defendants' motions for summary judgment are **GRANTED** in part and **DENIED** in part.

**a. The Teaming Agreement and Subcontracts**

First, Redline does not contest that the Teaming Agreement is a "valid, enforceable contract." (ECF No. 137 at 6). However, Redline points out that "no money is was due to AER" pursuant to it because the agreement "does not contain compensation terms." *Id.* Rather, the Teaming Agreement refers the parties to subcontracts, whose provisions govern payment obligations between the parties. *Id.* AER does not dispute that the subcontracts "governed the performance of individual projects," however it contends that the Teaming Agreement must be considered as part of the broad context of the parties' course of performance. (ECF No. 139-1 at 31). Therefore, regardless of whether the Teaming Agreement is independently enforceable, the parties agree that the subcontracts were valid and control performance obligations between the parties. The parties' disagreements, then, can be boiled down to two points: whether Redline's payment obligations under the subcontracts were independent or conditional; and if conditional; whether Redline monetized AER's work, or simply failed to collect on its invoices.

**b. Redline's obligation to pay under the Grant Management Subcontracts**

The central dispute under the grant management subcontracts turns on whether those contracts imposed on Redline an absolute duty to pay AER's invoices, or whether that duty was conditional on Redline's reimbursement from FEMA. Those subcontracts state, in relevant part, that the subcontractor, here AER, "agrees to paid when paid terms" (ECF No. 137 ¶ 250). Redline urges the Court to find a condition for payment. Namely, that "Redline's duty to pay arises [only] *when it receives* the corresponding DAC funds." (*Id.* at 9). AER, in turn, emphasizes that the Subcontracts required Redline to review each invoice and approve it for payment within five working days, that payment would be made "within forty-five (45) days of the month following the month invoiced," and contemplated that upon reimbursement from FEMA, Redline would then "immediately" pay any unpaid balance. (ECF No. 137-1 ¶¶ 251-56). These provisions, AER argues, imposed unconditional payment obligations on Redline, or at minimum, created timing obligations that Redline breached by failing to pay at least part of the invoices within a reasonable period. (ECF No. 135).

Puerto Rico law recognizes conditional obligations, commonly known as conditions precedent, whereby the existence of a duty "shall depend upon the event constituting the condition." 31 L.P.R.A. § 3042. Similarly, Puerto Rico law accounts for conditions that depend "upon the exclusive will" of a party, or forfeiture of any condition when "the obligated party should voluntarily prevent its fulfilment." 31 L.P.R.A. §§ 3043, 3047; *see also Punta Lima, LLC v. Punta Lima Dev. Co., LLC*, 425 F. Supp. 3d 87, 103-04 (D.P.R. 2019) (explaining that these conditions carry an implied duty to "make all necessary and reasonable efforts to fulfill said obligation").

As far as "pay-when-paid" clauses are specifically concerned, however, Puerto Rico cases provide "little guidance." *See Northstar Demolition & Remediation, LP v. GLE Assocs., Inc.*, No. CV 21-1547 (SCC), 2022 U.S. Dist. LEXIS 167956, at *7, 2022 WL 4291282, at *3 (D.P.R. Sep. 16, 2022). Indeed, this District's caselaw notes that these provisions "stem from North American jurisprudence," and that the Puerto Rico Supreme court has yet to address the issue. *Id.* (citing *Mid-N. Eng'g Corp. v. Autoridad de Carreteras*, No. DAC2002-3354, 2006 PR App. LEXIS 4, 2006 WL 314393 (P.R. Cir. Jan. 19, 2006)). In *Northstar Demolition & Remediation, LP v. GLE Assocsiates*, for example, the Court noted that although Puerto Rico case law distinguishes between "pay-when-paid" and "pay if paid" provisions, Commonwealth jurisprudence left open the possibility that a "pay-when-paid" provision

could be categorized as a condition. *Id.*

Moreover, the common law view of "pay-when-paid" clauses is that they are generally interpreted as a timing provision rather than a condition precedent, unless the contract contains clear and unequivocal language to the contrary. 8 Corbin on Contracts § 30.15 (2026). "Pay-if-paid" clauses, on the other hand, may establish a true condition precedent where the subcontractor assumes the risk of nonpayment but the contract must employ clear and explicit conditional language. *Id.* Absent such clear, risk-shifting language, a "pay-when-paid" clause does not condition the obligation to pay; instead, courts interpret it as a convenient timing provision for payment. *Id.* "The critical question … is whether the parties intended to reallocate the risk of no payment to [a] party." *Id.*

At this juncture, the Court is not satisfied that the Subcontracts can "be understood in one sense alone," leaving no room for interpretation. *See P.R. Tel. Co.*, 483 F.3d at 12. The "pay-when-paid" clause itself, as noted by Redline, contains no "qualification, contingency or reservation," that explicitly suggests *any and all* payments were conditioned upon receipt of FEMA funds. (ECF No. 142 at 8). Rather, the subcontracts contain various compensation provisions that contemplate "interim payments" within forty-five days of AER's invoices. (ECF 136-28 at 5). In fact, the contract provisions that specifically condition payment upon FEMA reimbursement allude to "unpaid" invoices. (*Id.*). Which, in its "literal sense," suggests that some payment must have already occurred. *See Fernandez-Fernandez*, 942 F. Supp. at 94 ("[C]ourts should enforce the literal sense of a written contract…."). The parties' course of performance, likewise, weighs against Redline's interpretation. The fact that Redline initially funded AER's invoices prior to FEMA reimbursement, what Redline now characterizes as loans, suggests the parties understood Redline's payment obligation to be independent of receipt of funds, or at minimum, that any conditional language was understood to create only a timing mechanism rather than an absolute condition precedent. (ECF No. 141 at 6).

Even assuming that the "pay-when-paid" clause functions as a condition precedent, two genuine disputes of material fact remain: whether Redline received payment for any or all of AER's receivables, thus satisfying the purported condition, and whether Redline exercised its "best efforts" to satisfy the condition, which was, at least partly, within its control. *See* 31 L.P.R.A. § 3043.

As to the first point, Redline argues that although it "has received some DAC payments from

the Applicants/Municipalities, those are not related to AER's work but to Redline's own work." (ECF No. 137 at 11). AER argues that, at a minimum, Redline "monetized the receivables generated by AER's completed work" by assigning its receivables to Group. (ECF No. 135-1 at 13). Redline's summary judgment record included several spreadsheets detailing its payments from different projects. (ECF No. 137-31). These documents, however, do not clearly set out which payments corresponded to AER's work. (*Id.*). To grant Redline summary judgment on this record, therefore, the Court would have to accept Redline's version of the story that it was never fully reimbursed for AER's work. (ECF No. 137 at 11). But that would entail a credibility determination, which the Court cannot make at this juncture.[4] *See Casas Off. Machines, Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 681 (1st Cir. 1994) ("Summary judgment 'admit[s] of no room for credibility determinations…'")(citing *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir. 1987)).

As to the second point, Redline failed to collect payment on at least one project, Toa Baja, thus causing its purported condition to pay AER to fail. Redline admits as much. In its reply, Redline cites to the very case that denied its recovery against the Municipality of Toa Baja case to argue that AER's recovery should also be time-barred. (ECF No. 138 at 5–7). This argument suggests two points damaging to Redline's argument: 1) that it failed to effect the condition to its payment to AER; and 2) it suggests that it also failed to make "best efforts" to pay AER's invoices on time.

First, still assuming the contracts contain a condition precedent, Redline's reliance on the Toa Baja decision is misplaced, and does not result in preclusion of AER's claims. (ECF No. 138). Even if the parties shared the understanding that the contracts were "pay-when-paid," AER would have had to rely on Redline's representations that it would collect payment for the municipal projects. (ECF No. 141 at 3). AER, therefore, would not have been put on notice that it would not receive payment for the Toa Baja project until Redline's claim against the municipality was adjudicated—in 2025. (*Id.*). At which time, the statute of limitations would begin to accrue. *See Calderón-Amézquita v. Rivera-Cruz*, 158 F.4th 54, 63 (1st Cir. 2025) (cleaned up) (reciting the requirements of "actual" and "deemed"

[4] In the Arecibo project, for example, Redline claims it received "$15,400 in DAC payments related to AER's work. Similarly, Redline asserts it received approximately $60,000 in DAC payments related to AER's work on the Canóvanas project." (ECF No. 137 at 10-11).

notice of a cause of action under Puerto Rico law). Accordingly, AER's claim would not be time-barred. *Id.* Second, it remains to be proven at trial to what extent Redline exercised its "best efforts" to recover payment from other Municipalities, and which, if any, of those payments correspond to AER's work.

What appears clear from Redline's own factual record is the amounts AER invoiced, and the total AER was paid. (ECF Nos. 137-31; 137-34). A spreadsheet calculating the payments and balance due between AER and Redline details that AER invoiced $3,257,083.25; Redline disbursed $1,230,519.79; and the remaining unpaid balance as of December 31, 2018 was $2,074,433.31. (ECF No. 137-31). Furthermore, an April 2019 letter signed by Redline's chief financial officer, confirmed that an external audit indicated a $2,026,563.56 balance still outstanding to AER. (ECF No. 137-34).

Indeed, even viewing AER's allegations in a light favorable to Redline, Defendants do not genuinely dispute that AER is owed money, but rather that Redline has no legal duty to pay until it gets paid, and that that amount must be reduced by any amounts Redline is owed.[5] Redline concedes that "AER is owed money for a long time, just like Redline is," and bemoans that "[f]reedom of contract includes the freedom to make a bad bargain." (ECF No. 137 at 11).

Redline cannot invoke a payment contingency in the abstract while avoiding scrutiny of its own records. Accordingly, the existence and amount of Redline's balance due to AER, based on its own summary judgment record, is not genuinely in dispute. Plaintiff's motion for partial summary judgment on the undisputed sum it is owed (ECF No. 135) is hereby **GRANTED**. Whether it was the parties' intent that payment of that sum be conditioned upon FEMA reimbursement, and whether any asserted condition was satisfied in whole or in part, present triable factual issues. Therefore, Plaintiff's motion for partial summary judgment on the Toa Baja project (ECF No. 134) is **GRANTED**, and Redline's motion for summary judgment is **DENIED** as to the breach of contract claim. (ECF No. 137).

**c. Redline's obligations under the Funding Agreement**

Material disputes regarding the Funding Agreement also preclude granting summary judgment

[5] Redline claims it to be "at least $1,230,430.36 in unpaid loan principal (SUMF ¶ 298), and $10,285.59 for shared office space and $8,408.92 for the Jenkins litigation." (ECF No. 137 at 11).

as to Count I. Redline has interchangeably claimed that it cannot locate the agreement (ECF No. 99); that it never signed it and thus not bound by it (ECF No. 137 at 7); or that, in any case, "the Funding Agreement at issue was not the document proffered by Plaintiff," but rather, a March 2018 email exchange in which Redline agreed to provide AER with funds "in the form of loans." *Id.* AER characterizes these funds differently. It claims that, based on the parties understanding and their course of performance, the funds were advances for completed work, which AER invoiced, and Redline approved. (ECF No. 139 at 10-11).

As an initial matter, although Defendants were ordered to produce an executed copy of the funding Agreement, and they failed to do so, the parties acknowledged the existence of such agreement. (ECF Nos. 86, 99). The parties dispute, however, the terms of the agreement. Specifically, whether the Funding Agreement required Redline to fund AER's invoices and whether Redline's advances to AER were payments or loans.

The written Funding Agreement, signed by AER provides that AER "retains [Redline] to assist AER in the prepayment of receivables under Contracts with [Redline]" and that Redline was to "make its best effort to fund 65%-75% of all invoices submitted" by AER. (ECF No. 136-16). In its motion for summary judgment, Redline, by contrast, contends that emails, rather than the written Funding Agreement, constituted the actual funding arrangement. (ECF No. 137 at 7). However, Redline relies on language from the written agreement which states that funding was provided only "on a best-efforts basis," with "no assurance as to availability of funds," and subject to a "3% flat fee" and "2% monthly interest." (ECF No. 137 at 8). From that language, Redline argues that any disbursements were loans subject to repayment, not payments under the written Funding Agreement.

Redline cannot selectively rely on the Funding Agreement while denying its existence or enforceability. Redline invokes the agreement's "Credit Facility" concept, fees, and alleged interest terms to characterize the disbursements as loans, yet simultaneously disputes that the written Funding Agreement imposed any binding obligation to fund 65%–75% of AER's invoices. (*Id.*). At minimum, Redline's inconsistent positions create a factual dispute as to whether the parties understood the Funding Agreement as a binding funding mechanism for work completed, a discretionary credit facility, or a loan arrangement. *See P.R. Tel. Co.*, F.3d at 12.

**d. Atlys Entities' obligations under the various contracts**

Because the Atlys entities' liability turns on issues beyond contract, the Court moves on to analyze claims against them separately. Indeed, these entities cannot be held liable merely because they were affiliated with Redline, financed Redline, or received assignments of Redline receivables. AER must show evidence justifying disregard of corporate separateness or establish direct liability through contract or agency law. In short, the extent of Group and Global's liability to AER turns on two points: 1) whether Redline's assignment of its receivables to Group, also transferred Redline's contractual liability to Group, leaving Redline an assetless "shell"; and 2) whether Rance MacFarland's representations, as Global's managing partner, established direct liability and bound Global to fund AER. For the reasons discussed below, genuine disputes of material fact preclude granting the Atlys entities' motion for summary judgment. (ECF No. 136).

Under Puerto Rico law, determining whether to disregard the corporate form involves a "highly fact-specific" inquiry, which considers the extent to which two corporations "may have disregarded corporate formalities; the degree of control exercised by the parent over the day-to-day operations of the subsidiary; overlap in ownership, officers, directors, and personnel; and whether the subsidiary was adequately capitalized." *De Castro v. Sanifill, Inc.*, 198 F.3d 282, 284 (1st Cir. 1999). To prevail, the proponent of piercing the corporate veil must produce "strong and robust" evidence of domination or misuse of the corporate form. *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980). "[W]hether the subsidiary is only an empty shell is a question of fact, and allegations of interlocking directorates and stock ownership will not alone suffice." *Id.* at 905.

AER argues that Group and Global's "overlapping management, centralized decision-making, coordinated financing, common personnel, integrated lending operations, and the repeated movement of Redline's assets among Robinson-controlled entities" could lead a reasonable factfinder to conclude that corporate separateness was disregarded between those entities. (ECF No. 140 at 21). Accordingly, any of Redline's contractual liability should be dispersed among the Atlys entities. (*Id.*).

Group submits that it never contracted with AER, so no contract liability can attach. (ECF No. 136 at 1-2). Rather, Redline assigned its receivables to Group through the Receivables Assignment Agreement. (*Id.*). As to Global, AER points to an email chain of "negotiations," whereby Rance

MacFarland appears to have contracted on Global's behalf to provide AER funding. (ECF No. 140 at 29). The details of this funding agreement are unclear, but it appears that MacFarland sent AER's Amanda Smith a loan application which she signed and returned. (ECF No. 137 ¶¶ 109-117). Then, AER relies heavily on an email from August 2018 where MacFarland, signing as Global's managing director, represented to third parties that Global had entered into a funding agreement with AER and Redline, claiming that "Atlys anticipates AER being funded on all of their outstanding receivables within the next 14 days." (ECF No. 139-22). Global counters that MacFarland "stepped out of line," and did not have actual or apparent authority to approve funding applications. (ECF No. 137-1 ¶¶ 140-41).

It is true that the Atlys entities and Redline are intertwined. Group is partly owned by Global, who also owns nonparties AG Redline, LLC and AG Redline Holdings, who in turn own Redline. (ECF No. 137-1 at 29, 32, 36). However, aside from the Receivables Assignment Agreement, the Court can discern no evidence that suggests a relationship beyond the purchase of the receivables between Group and Redline—AER's contracting party, or with AER directly.[6] Furthermore. AER points to no caselaw that suggests that an assignment of receivables from Redline to Group establishes contract privity between Group and AER. *See Cruz Berrios v. Accreditation Council for Graduate Med. Educ.*, 218 F. Supp. 2d 140, 143 (D.P.R. 2002) ("A stranger to a contractual relationship… may demand the fulfillment of a contract successfully only if the contract contains a stipulation in his favor…"). At this juncture, AER has not provided "strong and robust evidence" sufficient to establish Group's liability for Redline's corporate debts, to the extent that they exist.

However, Global's factual showing does not conclusively dispel the possibility of a contractual relationship. Indeed, further *factual* inquiry is required to determine the extent of Global's negotiations with AER, including the presentation of evidence as to Global's intent in providing AER funding. *See*

---

[6] AER's opposition to Group and Global's motion for summary judgment attempts to muster facts in support of its contention that Robinson's control over Group and Redline rendered Redline insolvent, and a mere vehicle for fraud. (ECF No. 14 at 18–25). These allegations, however, are not properly supported under Local Rule 56, and rely on untranslated Puerto Rico cases in violation of 48 U.S.C. § 864 and Local Rule 5(c). Therefore, the Court cannot consider them. *See Lopez-Hernandez*, 64 F.4th at 26.

*Inter-Island Ferry Sys. Corp. v. Puerto Rico Ports Auth.*, No. CV 15-3057 (BJM), 2017 U.S. Dist. LEXIS 181805, at *12, 2017 WL 4990556, at *4 (D.P.R. Oct. 31, 2017) ("Whether there was a meeting of the minds between the parties is a question of fact."). Similarly, the extent to which MacFarland acted as Global's agent, and within the scope of his authority to approve AER funding, is a triable factual issue. *See Torres v. Nat'l Ass'n of Underwater Instructors (NAUI)*, 928 F. Supp. 134, 138 (D.P.R. 1996) ("The existence of an agency relationship, as well as the scope of the agent's authority, is a question of fact to be decided by the jury."). Defendants' motion for summary judgment (ECF No. 136) is **GRANTED** as to Group, but genuine disputes of material fact preclude granting summary judgment as to Global. Global's motion for summary judgment is **DENIED** as to the breach of contract claim (Count I).

### III. Counts II-IV: Fraud, Fraud in the Inducement, and Negligent Misrepresentation against all defendants.

AER's initial motions for partial summary judgment did not substantively address the fraud-related claims asserted in Counts II through IV. (ECF Nos. 134, 135). Defendants, however, requested summary judgment on those claims and asserted a common defense: that the claims are time-barred under the Puerto Rico torts statute of limitations. (ECF Nos. 136, 137). Because the limitations issue is common to Counts II through IV, the Court addresses the fraud-related claims together, and finds that a genuine issue of material facts precludes granting summary judgment on these Counts.

Under Puerto Rico law, tort-based claims are subject to a one-year statute of limitations that begins to run once plaintiff is on notice of its claim or injury plus notice of the person who caused it. *See Calderón-Amézquita v. Rivera-Cruz*, 158 F.4th at 63.[7] Establishing when the limitations period begins to runs requires "[d]etermining the date on which a diligent plaintiff would have learned enough to allow her to file suit," which in turn "presents a question of fact that may be submitted to the jury in an appropriate case." *Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc.*, 812 F.3d 213, 216 (1st Cir. 2016)

---

[7] Although AER's claims against Defendants are based on a contractual relationship, "in Puerto Rico it is well settled that when one party to a contract is injured through the fault or negligence of the other party, the aggrieved individual's right of recovery ordinarily lies in tort in spite of the pre-existing contractual relationship." *Lexington Ins. Co. v. Abarca Warehouses Corp.*, 476 F.2d 44, 46 (1st Cir. 1973). Moreover, the parties do not dispute the applicable statute of limitations, but rather when the limitations period began to run.

(citing *Espada v. Lugo*, 312 F.3d 1, 4-5 (1st Cir. 2002)); *Villarini-Garcia v. Hosp. Del Maestro*, 8 F.3d 81, 87 (1st Cir. 1993) ("But even where no raw facts are in dispute, the issues of due diligence and adequate knowledge are still ones for the jury so long as the outcome is within the range where reasonable men and women can differ.").

Defendants contend that AER must have known all relevant facts that gave rise to its claim in 2018, because all "allegedly 'fraudulent' conduct described in the Complaint occurred in 2018." (ECF Nos. 136 at 18, 137 at 14). Therefore, the limitations period began running in 2018, and AER should have sued in 2019. *Id.* AER claims that it did not understand the full scope of Redline's financing structure until an August 2022 meeting with a former AER employee later employed at Redline, and subsequent production of financial records. (ECF Nos. 139 at 25, 140 at 32). According to AER, those materials showed that Redline and affiliated entities used AER-related receivables to secure financing while continuing to represent that AER could not be paid until Redline received municipal or FEMA-related funds. (ECF Nos. 139 at 25, 140 at 32).

Here, the undisputed record does not conclusively establish the date on which AER had actual notice of the alleged fraud. *See Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 16-17 (1st Cir. 1997) (noting that whether a plaintiff "reasonably relies upon representations of a tortfeasor," may be a question for the factfinder). A reasonable factfinder could conclude that AER's failure to discover the fraud resulted from a lack of diligence, and is thus time-barred—or alternatively, that no due diligence could have put it on notice of the alleged fraud due to concealment or misrepresentation by Redline or the Atlys entities. *See id.* Defendants' motions for summary judgment are **DENIED** as to counts II, III, and IV.

## IV. Counts V-VII: Breach of Fiduciary Duty, Equitable Accounting, and Unfair Trade Practices Claims, Conspiracy

Moving on the remaining claims. Defendants have met their burden to obtain judgment as a matter of law. Therefore, AER's remaining claims can be summarily disposed of.

### a. Breach of Fiduciary Duty

First, a contractual relationship does not generally give rise to fiduciary duties. *See Fashion House, Inc. v. K-mart Corp.*, 892 F.2d 1076, 1091 (1st Cir. 1989) ("Without more, the mere existence of

garden-variety price disputes between business partners, even agent and principal, does not present an actionable breach of fiduciary duty.") (citing *Minnesota Farm Bureau Marketing Corp. v. North Dakota Agric. Marketing Assoc.,* 563 F.2d 906, 912-13 (8th Cir. 1977)). A fiduciary duty requires a special relationship of "trust and confidence" beyond that of a traditional arm's length business relationship. *See FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 102 (1st Cir. 2009) (outlining the requirements of a fiduciary duty); *see also Montalvo v. LT's Benjamin Recs., Inc.*, 56 F. Supp. 3d 121, 137-38 (D.P.R. 2014) (dismissing a breach of fiduciary duty claim where plaintiff conclusively claimed that defendant had "complete control over collection of their royalties"). AER's argument whereby the Teaming Agreement, and Redline's subsequent "exclusive control" over their joint projects' finances could lead a factfinder to find a fiduciary duty is insufficient. (ECF No. 139 at 30, 140 at 35). AER's reliance on *Sociedad de Gananciales v. Vélez & Associates*, and *Ramos Lozada v. Orientalist Rattan Furniture Inc.*, is also misplaced. *See Sociedad de Gananciales v. Vélez & Assocs.*, 145 D.P.R. 508, 521 (1998); *Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712 (1992). Those cases discuss the imposition of non-contractual duties, i.e. tort-based duties under the Puerto Rico Civil Code, not fiduciary duties. *Id.* The record shows that AER and Redline established an independent contractor business relationship, as evidenced by the Teaming Agreement. (ECF No. 136-15). The Agreement itself states that "no party shall have any control over the other." (*Id.*) This relationship by itself does not give rise to fiduciary duties. Accordingly, Defendants' motions for summary judgment (ECF Nos. 136, 137) are **GRANTED** as to the breach of fiduciary duty claim (Count V).

**b. Equitable Accounting**

Similarly, AER's claim for equitable accounting (Count VI) also fails. Although "not defined" in Puerto Rico law, an accounting is an equitable remedy designed to deprive "wrongdoers of their net profits from unlawful activity." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 121 F.4th 280, 315 (1st Cir. 2024); *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 79 (2020). An equitable remedy is generally unavailable when legal remedies, such as contract damages, are sufficient. *See CMI Cap. Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 76 (D.P.R. 2006) (noting that the Puerto Rico Civil Code "clearly provides that courts must not decide cases based in equity unless there is no applicable statute") (citing 31 L.P.R.A. § 7). AER claims, however, that it is entitled to an equitable remedy

because Redline possessed "exclusive control" over the parties' financial information. (ECF No. 139 at 32). Therefore, to determine the exact amount of proceeds Redline generated from AER's work, an equitable accounting is necessary. (*Id.*). Having established that no fiduciary relationship existed between the parties, and seeing as AER's breach of contract claim against Redline already requests a specific damages award traceable to Redline's own records, an equitable accounting is neither warranted nor necessary. Defendants motions for summary judgment are **GRANTED** as to equitable accounting claim (Count VI). (ECF Nos. 136, 137).

**c. Consumer Protection Laws**

AER originally requested relief under the Louisiana Unfair Trade Practices Act ("LUTPA"). (ECF No. 23). In its opposition to summary judgment, AER now argues that its claims would find equal footing under Article 3 of Puerto Rico's Antitrust Act, or Puerto Rico's Consumer Protection Act. (ECF No. 139 at 34). AER pleads that, regardless of applicable law, Defendants' "coordinated conduct" of concealing an opaque financing structure denied it the economic benefits of its work, and is thus actionable under either body of law. (ECF No. 140 at 38). The Court is not inclined to allocate trial time to this issue based on such a bare-bones showing. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work …"). Let alone, one asserted at this juncture of the proceedings.

First, the Teaming Agreement, executed by AER and Redline, is the only operative agreement that refers to Louisiana law. (ECF No. 136-15). Therefore, Louisiana law would be relevant only to the interpretation of that agreement, not to the disposition of the case as a whole. *See Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 204 (1st Cir. 2015) ("Federal courts sitting in diversity apply the substantive law of the state and, pursuant to statute, Puerto Rico is treated as a state for diversity purposes.").

Perhaps more importantly, AER would not have been protected by LUTPA in any case. LUTPA grants protections for "transaction[s] involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family or household use." *Orthopedic & Sports Inj. Clinic v. Wang Lab'ys, Inc.*, 922 F.2d 220, 226 (5th Cir. 1991) (quoting La. Stat. Ann. § 51:1402). AER is neither a natural person nor are the transactions at issue "for personal, family, or

household use." *Id.* Further, LUTPA has a one-year prescription period. *See* La. Stat. Ann. § 51:1409. LTUPA is therefore not a viable vehicle for the relief AER seeks.

Under Puerto Rico law, AER faces a twofold problem: the Antitrust Act does not support a private right of action, and Puerto Rico's Consumer Protection Act, like LUTPA, protects only natural persons. *Diaz v. Hyundai Motor Co.*, 501 F.3d 12, 15 (1st Cir. 2007) ("The Antitrust Act explicitly states that there is no private right of action for a violation of section 259(a)…"); *Mun. of Bayamon v. Exxon Mobil Corp.*, No. CV 22-1550 (SCC)(HRV), 2025 U.S. Dist. LEXIS 36750, at *104-05, 2025 WL 600430, at *40 (D.P.R. Feb. 20, 2025) (subsequent history omitted) (explaining that the Puerto Consumer Affairs regulations protect only natural persons and that the Department of Consumers Affairs has exclusive enforcement jurisdiction). Defendants' motions for summary judgment are **GRANTED** as to Count VII. (ECF Nos. 136, 137).

**d. Conspiracy**

Finally, Defendants' motions for summary judgment are granted as to the civil conspiracy claim (Count VIII). (ECF Nos. 136, 137). Defendants argue that civil conspiracy is not recognized under Puerto Rico law. (*Id.*); *see also Kopittke v. Dealer Mkt. Exch. PR LLC*, No. CV 21-1059 (ADC), 2022 U.S. Dist. LEXIS 104419, at *6, 2022 WL 22895016, at *3 (D.P.R. Mar. 31, 2022) (noting that "civil conspiracies simply do not exist in Puerto Rico general tort causes of action"). AER concedes that the "alleged conspiracy is not an independent cause of action," but muddles its effect arguing conspiracy is "the factual mechanism through which Defendants jointly committed the underlying wrongful conduct." (ECF 140 at 40). AER alleges that its theory of conspiracy is relevant to establishing either joint liability or fraudulent conduct alleged elsewhere in its pleadings. (*Id.*). As mentioned above, the Court is under no duty to develop the parties' arguments for them. *See Zannino*, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). If civil conspiracy is not actionable under Puerto Rico law, then AER's claim fails as a matter of law. Defendants' motions for summary judgment are **GRANTED** as to Count VIII. (ECF Nos. 136, 137).

## CONCLUSION

For the aforementioned reasons, the Plaintiff's motions for partial summary judgment are **GRANTED**. (ECF Nos. 134, 135). Redline's motion for summary judgment is **DENIED** as to Counts I-IV and **GRANTED** as to Counts V-VIII. (ECF No. 136). Group's motion for summary judgment is **GRANTED** as to Count I, **DENIED** as to Counts II-IV, and **GRANTED** as to Counts V-VIII. (ECF No. 137). Global's motion for summary judgment is **DENIED** as to Counts I-IV and **GRANTED** as to Counts V-VIII. (ECF No. 137).

**IT IS SO ORDERED**.

In San Juan, Puerto Rico this September 8, 2026 .

***s/ Mariana E. Bauzá-Almonte***
MARIANA E. BAUZÁ-ALMONTE
United States Magistrate Judge